## Case No. 206.

### ALLEGHANY FERTILIZER CO v. WOODSIDE.

[1 Hughes, 115; Cox, Manual Trade-Mark Cas. 206.][1]

Circuit Court, D. Maryland. 1871.

TRADE-MARKS — WHAT WILL BE PROTECTED — "EUREKA" AS A NAME.

The word "Eureka," first used by complainants in a compounded fertilizer which they call the "Eureka Ammoniated Bone Superphosphate of Lime," and have used for several years, is a trade-mark, in the exclusive use of which they have the right to be protected by the courts.

[See note at end of case.]

In equity. The complainants, a Boston company, are the manufacturers of a fertilizer to which they have given the name of "Eureka Ammoniated Bone Superphosphate of Lime." The defendants manufacture a fertilizer which they call the "Baltimore 'Eureka' Ammoniated Bone Superphosphate of Lime." At a former hearing the court had refused the complainants' application for a preliminary injunction, because the defendants, in their answer, denied that the appropriation of the name as a trade-mark was original with the complainants. The testimony, however, proved conclusively that the name originated with the complainants in 1865, and that its use by them had been continuous and exclusive to the present time, and under that name the fertilizer manufactured by them had become widely known. [Injunction granted.]

S. T. Wallis and T. W. Hall, for complainants.

J. H. B. Latrobe and J. A. Preston, for defendants.

GILES, District Judge. The natural or proper designation of an article can never become a trade-mark, because anybody making the article has a right to call it by its proper name. Upon this ground, in a previous case, the court had refused protection to the name "Balm of a Thousand Flowers" as a trade-mark, because it had been proved that it was a common designation among per-

[1][Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission. Only partially reported in Cox, Manual Trade-Mark Cas. 206.]

fumers, having its correlative in various European languages, e. g., the French "mille fleurs," Italian "milli flori," etc. But a purely arbitrary or fanciful appellation, for the first time used to distinguish an article to which it has no natural or necessary relation, does, by virtue of that very appropriation, and subsequent use, become a trade-mark. Such was the Greek word "Eureka," applied to a fertilizer. The same might be said of a symbol or sign, such as a cross, a star, or lion, which, when stamped upon a particular article, may become its distinctive mark, and will be upheld as such so soon as the article becomes known and distinguishable by that mark. But the words "ammoniated bone superphosphate of lime" being the proper name of an article which anybody may make or sell, by themselves could never constitute a trade-mark. "Eureka" was, therefore, for the purpose, and in the connection in which it was used, the complainants' trade-mark. By it the fertilizer manufactured by them became known, was bought and sold, and acquired its reputation. Persons at a distance desiring to order it wrote to their merchants, "Send me ten, twenty, or thirty tons of 'Eureka.'" Even in the trade it was far better known by this name, as the testimony showed, than by the name of the manufacturer or place of manufacture. The name was, therefore, valuable to the complainants, and they were entitled to be protected in the enjoyment of it as their trade-mark. To deny this protection would be a reproach to the law or to a court of equity. If it was not valuable, why did the defendants seek to appropriate it, when all the languages of the earth were open to them from which to make their selection? If it had no value in their eyes, why did they take the advice of counsel as to their right to use it? This very conduct of the defendants proved that, in their estimation, it was a thing of value to the complainants. But it was argued the name adopted by the complainants did not sufficiently indicate "origin and ownership" to be regarded as a trade-mark. This was a mistake. It served to distinguish the complainants' manufacture quite as effectually as names ever serve to distinguish things. The doctrine contended for would invalidate ninety-nine in a hundred of the trade-marks which had been upheld by the courts. It was also said that no violation of the complainants' rights had been attempted by the defendants, inasmuch as they did not profess to sell their fertilizer as the manufacture of the complainants, but the contrary, and their advertisements in the newspapers had been read in proof of this fact. This was also illusory. They had attempted, by the appropriation of the complainants' trademark, to profit by the reputation their fertilizer enjoyed in the market, with the value of which they were well acquainted, having been for several years the complainants' agents in this city. Besides, the fertilizer

was widely sold in different portions of the south, where the defendants' advertisements might never be seen. It was in evidence that persons had been deceived, that a farmer in Virginia, wishing to buy the article he had used and tested for several years, which was the complainants', had bought the defendants' instead, misled by the name. This was all wrong, and whatever the intentions of the defendants might be, it was a fraud in law, which it is the duty of this court to prevent. Nor was it necessary that the defendants should have copied the entire trademark of the complainants, or that the verbal or physical resemblance of the two marks, placed side by side, should be complete. They had taken the essential part of the complainants' mark when they took the word "Eureka."

[The following statement by the reporter, Hon. Robert W. Hughes, was appended to the opinion:]

Judge Giles referred to various authorities in support of the views he had expressed. He read with particular approbation the opinion of Lord Cranworth in the case of Seixo v. Provezende, reported in [L. R.] 1 Ch. App. [192,] as containing the clearest exposition of the law of trade-marks he had found; also a recent decision of the supreme court of Missouri, reported in the July number of the American Law Register for 1869, [Filley v. Fassett, 44 Mo. 169, 100 Amer. Dec. 275,] in which the name "Charter Oak," as applied to a stove, had been upheld as a trade-mark, and which, the learned judge said, fully covered the ground of the present case. The conclusion of the whole matter, in his opinion, was that, when the right of a manufacturer or dealer to a particular trade-mark had, by priority of appropriation, been once established, no rival manufacturer was at liberty to use the same mark for the same purpose, even in connection with his own name and place of manufacture. He would, therefore, sign a decree in the present case perpetually enjoining the defendants from any use of the complainants' mark.

[NOTE. Arbitrary words used for the first time to distinguish the productions of one person from those of another may become a valid trade-mark, and will be protected by injunction; such, for instance, as the "Star Shirt," (Morrison v. Case, Case No. 9,845;) "Anti Washboard" soaps, (O'Rourke v. Central City Soap Co., 26 Fed. Rep. 576;) "Chatterbox," as applied to a series of juvenile publications, (Estes v. Williams, 21 Fed. Rep. 189;) "Goodyear," as applied to manufactures of rubber, (Goodyear Rubber Co. v. Goodyear's Rubber Manuf'g Co., 21 Fed. Rep. 276.) To the same effect, see Roberts v. Sheldon, Case No. 11,916; Shaw Stocking Co. v. Mack, 12 Fed. Rep. 707; Kinney v. Allen, Case No. 7,826. The limitations upon the use of devices as trade-marks are well defined. The object of the trade-mark is to indicate, either by its own meaning or by association, the origin or ownership of the article to which it is applied. Manufacturing Co. v. Trainer, 101 U. S. 51. This object of the trade-mark and the consequent limitations upon its use are well stated in Canal Co. v. Clark, 13 Wall. (80 U. S.) 311,

by Mr. Justice Strong,—that "no one can claim protection for the exclusive use of a trade-mark or trade-name which would practically give him a monopoly in the sale of any goods other than those produced or made by himself. If he could, the public would be injured, rather than protected, for competition would be destroyed. Nor can a generic name, or name merely descriptive of an article of trade, of its qualities, ingredients, or characteristics, be employed as a trade-mark, and the exclusive use of it be entitled to legal protection." Consequently the use of a geographical name as a trade-mark will not be protected if naturally applicable to the article to which it is applied, such as "Pennsylvania Wheat," "Kentucky Hemp," "Virginia Tobacco," "Sea Island Cotton," (Canal Co. v. Clark, supra;) but where the geographical name is used in a manner calculated to deceive, as "St. Louis Lager Beer," applied by a New York brewer to his own production, such illegitimate use will be enjoined in favor of a brewer in St. Louis who had established a trade and reputation as a manufacturer of "St. Louis Lager Beer," (Anheuser-Busch Brewing Ass'n v. Piza, 24 Fed. Rep. 149.) So, also, it was held that the use of words calculated to deceive will not be protected, such as "straight cut" arbitrarily applied to tobacco to which it is not applicable, (Ginter v. Kinney Tobacco Co., 12 Fed. Rep. 782,) or "Mason's Patent, Nov. 30, 1858," or "Mason Jar of 1858," when in fact the jar was not patented, (Consolidated Fruit-Jar Co. v. Darflinger, Case No. 3,129.) See, also, Seabury v. Grosvenor, Id. 12,576, and Manhattan Medicine Co. v. Wood, 2 Sup. Ct. Rep. 436, 108 U. S. 218. The word "Centennial" is an example of a word which has by general use become common property, Hartwell v. Viney, Case No. 6,173a. For a summary of the law of trade-marks, see Columbia Mill Co. v. Alcorn, 150 U. S. ——, 14 Sup. Ct. Rep. 151.]